UNITED STATES DISTRICT COURT                              b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

JOSHUA KEITH BRUCE              CIVIL ACTION NO. 1:15-CV-02884

VERSUS                         JUDGE TRIMBLE

U.S. COMMISSIONER, SOCIAL      MAGISTRATE JUDGE PEREZ-MONTES
SECURITY ADMINISTRATION

---

REPORT AND RECOMMENDATION

I.    Background

A.    Procedural Background

Joshua Keith Bruce ("Bruce") filed an application for Social Security Disability Insurance Benefits ("DIB") on October 16, 2014, alleging a disability onset date of November 1, 2010 (Doc. 7-1, p. 168/754) due to post-traumatic stress disorder ("PTSD"),[1] major depression, anxiety, lower lumbar strain, sciatica, tinnitus, hearing loss, his right thumb is broken and partially immobile, idiopathic thrombocytopenic purpura, and rotator cuff/surgery  (Doc. 7-1, pp. 103, 192/754).  That application was denied by the Social Security Administration ("SSA") (Doc. 7-1, p. 114/754).

---

[1] Post-traumatic stress disorder is a type of anxiety disorder. It can occur after you have gone through an extreme emotional trauma that involved the threat of injury or death.  Health care providers do not know why traumatic events cause PTSD in some people, but not in others. Genes, emotions, and family setting may all play roles. Past emotional trauma may increase your risk of PTSD after a recent traumatic event.  With PTSD, the body's response to a stressful event is changed. Normally, after the event, the body recovers. The stress hormones and chemicals the body releases due to the stress go back to normal levels. For some reason in a person with PTSD, the body keeps releasing the stress hormones and chemicals.  PTSD can occur at any age.  There are four types of PTSD symptoms: (1) reliving the event, which disturbs day-to-day activity; (2) avoidance; (3) hyperarousal; and (4) negative thoughts and mood or feelings.  You may also have symptoms of anxiety, stress, and tension. MEDLINEplus Health Information, Medical Encyclopedia: Post-traumatic stress disorder, *available at* https://medlineplus.gov/ency/article/000925.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health).

A *de novo* hearing was held before an administrative law judge ("ALJ") on August 4, 2015, at which Bruce appeared with his attorney, a vocational expert ("VE"), and a witness (Doc. 7-1, p. 37/754).[2]  The ALJ found that, as of his date last insured, December 31, 2014, Bruce was a younger individual (34 years old) who suffers from "severe impairments" of post-traumatic stress disorder, hypertension, history of substance abuse, obesity (BMI 42), stage 2 kidney disease, lumbar strain, and a history of precancerous skin lesion (Doc. 7-1, pp. 24, 32/754).  The ALJ also found that Bruce has the residual functional capacity to perform light work, except that he cannot do complex work, he should work with things rather than with people, and he should work in an environment with only occasional interaction with others (Doc. 7-1, p. 27/754).  The ALJ found that, as of December 31, 2014, there were jobs that existed in significant numbers in the national economy that Bruce could do, such as cafeteria attendant and price marker (Doc. 7-1, pp. 32-33/754).  The ALJ concluded that Bruce was not disabled, as defined in the Social Security Act, at any time from November 1, 2010 through December 31, 2014 (Doc. 7-1, p. 33/754).

Bruce requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 7-1, p. 5/754), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Bruce next filed this appeal for judicial review of the Commissioner's final decision.  Bruce raises the following issues for judicial review (Doc. 8):

---

[2] An earlier *de novo* hearing, held before an ALJ on July 3, 2014, is also in the record; it predates the October 16, 2014 application for benefits that is before this Court (Doc. 7-1, p. 69/754).

1.  The ALJ erred in failing to properly evaluate and incorporate Bruce's mental impairments as documented by the Veterans Administration ("VA").

2.  The ALJ erred in the construction of the residual functional capacity ("RFC") by not adding evidence of Bruce's mental limitations.

3.  The ALJ erred in his application of step 3 of the sequential procedure.

4.  The ALJ failed to follow regulations by avoiding the testimony of a medical examiner.

The Commissioner filed a reply brief (Doc. 9), to which Bruce filed a response (Doc. 10).  Bruce's appeal is now before the Court for disposition.

## B.   Factual Background

### 1.   Medical Records

Bruce was in the Army Reserves in 2001 and in the Active Army in 2002-2006 (Doc. 7-1, p. 657/754).  Bruce is a combat veteran (two tours in Iraq) who has a 100% service-connected disability rating for PTSD,[3] and has a history of traumatic brain injury ("TBI") with loss of consciousness for one week (Doc. 7-1, pp. 657-59, 665-667/754).  The TBI was caused when Bruce was hit by an IED and knocked sideways, and debris hit his head (Doc. 7-1, p. 685/754).  Bruce also passed out and lost consciousness for several hours in about March 2004 due to his idiopathic thrombocytopenic purpura ("ITP")[4] (Doc. 7-1, p. 685/754).  That event also injured

---

[3] Bruce saw his friends wounded, he was hit by an IED, tanks blew up, he shot people, and fellow soldiers were wounded (Doc, 7-1, p. 679/754).

[4] ITP is a bleeding disorder in which the immune system destroys platelets, which are necessary for normal blood clotting.  People with the disease have too few platelets in the blood.  MEDLINEplus Health Information, Medical Encyclopedia: Idiopathic thombosytopenic purpua (ITP), *available at* https://medlineplus.gov/ency/article/000535.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health).

Bruce's left knee and back, and caused sciatica (Doc. 7-1, p. 685/754). Bruce's PTSD was diagnosed in 2005 (Doc. 7-1, p. 679/754).

Bruce graduated from high school and has a B.S. degree in criminal justice with a minor in political science (Doc. 7-1, p. 680/754). Bruce last worked in 2009 and has had over 20 jobs (Doc. 7-1, p. 681/754). He is divorced and has no children (Doc. 7-1, p. 681/754).

In 2008, Bruce was diagnosed with dermatophytosis, pure hyperglyceridemia, lower leg joint pain, adjustment disorder with mixed anxiety and pressed mood, and alcohol dependence (Doc. 7-1, pp. 282-284/754). In 2009, Bruce was diagnosed with gynecomastia, obesity, and numbness   (Doc. 7-1, p. 277-78/754).

In 2010, Bruce was diagnosed with shoulder joint pain, allergic rhinitis, posttraumatic stress disorder, mycosis, and obesity (Doc. 7-1, p. 279-80/754). In March 2010, Bruce underwent arthroscopic surgery by Dr. David DeLapp to repair a rotator cuff tear, a SLAP tear/anterior labral tear, and bony impingement syndrome (Doc. 7-1, p. 380/754).

In February 2010, Bruce tore the rotator cuff in his right shoulder at work (Doc. 7-1, pp. 386-87/754). In March 2010, Bruce underwent a rotator cuff tear repair, a partial acromionectomy, an anterior labral tear repair, and a debridement-type SLAP tear repair (Doc. 7-1, p. 383/754). Post-surgery, Bruce underwent physical therapy and was found to noncompliant with his restrictions (no driving, wear a sling, and restrict use of his shoulder) (Doc. 7-1, p. 380/754). In April 2010, Bruce reinjured his right shoulder when he was handcuffed behind his back in an altercation with

4

law enforcement (Doc. 7-1, p. 379/754).  Bruce continued his physical therapy, which increased his strength, and he no longer had popping and catching (Doc. 7-1, pp. 373-377/754).  Bruce gained weight in 2010 (Doc. 7-1, p. 687/754).

In 2011, Bruce had enlarged lymph nodes and major depressive affective disorder (recurrent episode, moderate degree) (Doc. 7-1, p. 278-79/754).  A PET/CT scan of Bruce's lymph nodes showed only minor abnormalities and no relapse of Hodgkin's disease.  In 2013, Bruce was also diagnosed with male erectile disorder and Peyronie's disease (Doc. 7-1, p. 554-55/754).

In March 2012, seven pre-cancerous skin lesions were excised (Doc. 7-1, pp. 546/754).  In February 2012, Bruce reported swelling in the left side of his face (Doc. 7-1, p. 472/754) that was diagnosed as left sub mandibular lymphadenopathy (Doc. 7-1, p. 449/754).  In 2012, Bruce was diagnosed with hemangioma, tinnitus, diabetes mellitus (Type II) (without mention of complications), and lumbago (Doc. 7-1, p. 276-77/754)

Bruce participated in a study at St. Jude Children's Research Hospital in March 2012 (Doc. 7-1, pp. 399-404/754).  Bruce was invited to participate in the study because he had childhood cancer (Hodgkin's disease) that was treated at St. Jude Children's Hospital (Doc. 7-1, p. 397-98, 407/754).  Bruce's test results showed he has abnormal lipid levels, borderline high blood pressure, left ventricular hypertrophy, mitral regurgitation in a heart valve, left ventricle trabeculation (with normal anatomic structure), overweight, was within the diabetes risk profile, had an abnormal thyroid hormone level (lightly low Free T4), anemia, a liver mass/hepatic

hemangioma, fatty liver (steatohepatitis), low testosterone, no sperm, and kidney stones in both kidneys (Doc. 7-1, p. 399-404, 617-622/754).

In 2013, Bruce was diagnosed with male erectile disorder, and Peyronie's Disease (Doc. 7-1, p. 276/754).

In November 2013, Bruce spent one week in an inpatient Psychiatric unit at the Alexandria VAMC for suicidal ideation, depression, and PTSD symptoms (Doc. 7-1, p. 523/754). The VA Police and the Rapides Parish Sheriff's Department removed Bruce's fund (Doc. 7-1, p. 523/754).

Bruce receives monthly service-connected compensation from the VA because he has a 100% service connected disability rating, as of November 13, 2013,[5] for post-traumatic stress disorder with major depression and alcohol abuse (Doc. 7-1, pp. 265-66/754). The VA based that decision on its findings that Bruce has: (1) intermittent inability to perform activities of daily living; (2) total occupation and social impairment; (3) intermittent inability to perform maintenance of minimal personal hygiene; (4) difficulty in adapting to work; (5) near-continuous panic affecting the ability to function independently, appropriately and effectively; (6) difficulty in adapting to stressful circumstances; (7) suicidal ideation; (8) inability to establish and maintain effective relationships; (9) near-continuous depression affecting the ability to function independently, appropriately, and effectively; (10) impaired impulse control; (11) difficulty in adapting to a work-like setting; (12) disturbances of motivation and mood; (13) flattened affect; (14) difficulty in establishing and

---

[5] Before November 13, 2013, Bruce had a 70% service-connected disability rating from the VA (Doc. 7-1, p. 260/754).

maintaining effective work and social relationships; (15) panic attacks more than once a week; (16) impaired judgment; (17) depressed mood; (18) chronic sleep impairment; (19) anxiety; and (20) suspiciousness (Doc. 7-1, pp. 269-70).

The VA also assigned Bruce specific service-connected disability ratings in November 2013 (Doc. 7-1, p. 266/754):

1. 10% for status post-right thumb injury (with a likelihood for improvement);

2. 10% for lumbar strain (combined range of motion of thoracolumbar spine from 120 to 235 degrees, and forward flexion of the thoracolumbar spine from 60 to 85 degrees);

3. 10% for tinnitus (recurrent);

4. 10% for radiculopathy, left lower extremity associated with lumbar strain (mild incomplete paralysis); and

5. 10% radiculopathy, right lower extremity associated with lumbar strain (mild incomplete paralysis).

Bruce received counseling for his PTSD at the VA and participated in the PTSD clinic (Doc. 7-1, pp. 312-13, 320-25, 331-334, 344-47, 352-59, 370-71, 441-46, 452-465, 518-529, 558-59, 569, 627-633, 660-64, 678-83, 689-90, 701, 709-12, 714-19/754). Bruce's goals were to reduce anxiety/stress, improve mood, and improve coping skills (Doc. 7-1, pp. 345, 357, 370, 380, 444/754).

In January 2014, Bruce weighed 260 pounds and his blood pressure was 131/77 (Doc. 7-1, p. 496/754).  Bruce had an enlarged lymph node under the left side of his jaw (a consult was ordered), and a hemangioma to the liver (Doc. 7-1, p. 496/754).  In April 2014, the biopsy of Bruce's enlarged lymph node showed no metastatic potential and complete excision was recommended (Doc. 7-1, pp. 544/754).  An audiology test

showed normal hearing in his right ear and sensorineural hearing loss (500-4000 Hz) in his left ear ((Doc. 7-1, pp. 531-32/754).   The hearing loss causes Bruce to have difficulty understanding conversation in the presence of background noise (Doc. 7-1, pp. 533/754).   Bruce was also diagnosed with PTSD, recurrent major depression (secondary to and due to PTSD), and alcohol abuse (as self-medication for PTSD, to avoid thinking about his traumas) (Doc. 7-1, pp. 521-22/754).   Bruce reported he was drinking alcohol to get drunk two or three times a month (Doc. 7-1, p. 523/754).

In January 2014, it was noted that Bruce had not been able to find or keep employment since December 2012 (Doc. 7-1, pp. 524/754).   Bruce was also on academic probation for the past three semesters at LSUA for failing grades or dropping classes (Doc. 7-1, pp. 524/754).   Bruce reported he had not been able to attend classes with students that appeared Muslim or of Arab descent, so he had missed classes and fallen behind in his work, leading him to drop or fail classes (Doc. 7-1, pp. 524/754).   Bruce also reported that his concentration was adversely affected by his anxiety, and his grade point average had dropped in the past fourteen months from Honor Student to Academic Probation (Doc. 7-1, pp. 524/754).

A PTSD evaluation by a VA psychologist, Kelly Pears, in January 2014 showed that Bruce directly experienced traumatic events and personally witnessed traumatic events as they occurred to others, and that he met every criterion and symptom listed on the evaluation (Doc. 7-1, pp. 520, 524/754).   The evaluation also showed Bruce has intrusive symptoms since those traumatic events of: (1) recurrent, involuntary and intrusive distressing memories of the traumatic events; (2) recurrent distressing

dreams in which the content and/or affect of the dream are related to the traumatic events; (3) dissociative reactions (flashbacks) in which the individual feels or acts as if the traumatic events are recurring; (4) intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic events; and (5) marked physiological reactions to internal or external cues that symbolize or resemble and aspect of the traumatic events (Doc. 7-1, p. 524/754). Bruce has intrusion symptoms associated with the traumatic events: persistent avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic events; and avoidance of or efforts to avoid external reminders (Doc. 7-1, p. 524/754).   Bruce also has negative alterations in cognitions and mood associated with the traumatic events, including persistent and exaggerated negative beliefs or expectations about oneself, others, or the world; persistent, distorted cognitions about the cause or consequences of the traumatic events that lead to the individual to blame himself or others; persistent negative emotional state; markedly diminished interest or participation in significant activities; feelings of detachment or estrangement from others; and persistent inability to experience positive emotions (Doc. 7-1, pp. 524-25/754).   Bruce was found to have marked alterations in arousal and reactivity associated with the traumatic events: irritable behavior and angry outbursts with little or no provocation, typically expressed as verbal or physical aggression toward people or objects; reckless or self-destructive behavior; hypervigilance; exaggerated startle response; problems with concentration; and sleep disturbance.

The VA psychologist found that Bruce's symptoms had lasted more than one months, clause clinically significant distress or impairment in social, occupation, or other important areas of functioning, and the disturbance is not attributable to the physiological effects of a substance, such as alcohol or medication, or another medical condition (Doc. 7-1, p. 525/754).  The VA psychologist listed Bruce's symptoms: depressed mood; anxiety; suspiciousness; panic attacks more than once a week; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively; chronic sleep impairment; impairment of short- and long-term memory; flattened affect; impaired judgment; disturbances or motivation and mood; difficulty in establishing and maintaining effective work and social relationships; difficulty in adapting to stressful circumstances, including work or a work-like setting; inability to establish and maintain effective relationships; suicidal ideation; impaired impulse control, such as unprovoked irritability with periods of violence; and intermittent inability to perform activities of daily living, including maintenance of minimal personal hygiene (Doc. 7-1, p. 526/754).  The VA psychologist stated that Bruce was anxious, and tearful when discussing his decline in grades, breakup with his girlfriend, and his inability to complete tasks.

The VA psychologist concluded that Bruce's PTSD checklist score was 77, and his Beck Depression Inventory-2 ("BDI") score was 54, indicating severe depression. Bruce's level of functioning had markedly deteriorated since December 2012, and that he would be a markedly unreliable employee due to his inability to maintain a regular schedule and his irritability with angry outbursts (Doc. 7-1, pp. 526-27/754).  The

psychologist stated that it is at least as likely as not that Bruce would not be able to complete a work week without interruption from psychologically based symptoms, and it is at least as likely as not that the veteran would not be able to complete a work week without being disruptive to coworkers due to psychologically based symptoms (Doc. 7-1, p. 527/754)..

Later in January 2014, Bruce reported he had recently returned to school, stopped drinking, joined a gym, and was ready to address his PTSD symptoms (Doc. 7-1, pp. 528/754).

In October 2014, Bruce called to reschedule a PTSD clinic appointment because he was being evicted, and declined VA housing assistance (Doc. 7-1, p. 319/754).  In his PTSD counseling sessions, Bruce discussed his hypervigilance and avoidance, flashbacks, and panic attacks (Doc. 7-1, p. 320/754).  Bruce scored 75 on a PTSD reassessment (Doc. 7-1, p. 323/754).  The VA social worker, Francis J. Powell, Ph.D., LMSW, found that Bruce suffers: extremely from repeated disturbing memories, thoughts, or images of the stressful past experiences;, extremely from repeated disturbing dreams of the past stressful experiences; quite a bit from acting or feeling as if the past stressful experiences were happening again (reliving them); quite a bit from feeling very upset when something reminds him of the past stressful experiences; extremely from physical reactions (heart pounding, trouble breathing, sweating) when something reminds him of the past stressful experiences; quite a bit from avoiding thinking or talking about, or avoiding having feelings related to, the past stressful experiences; extremely from avoiding activities or situations because

11

they reminded him of the past stressful experiences; moderately from trouble remembering important parts of the past stressful experiences; extremely from loss of interest in activities he used to enjoy; extremely from feeling distant or cut off from other people; moderately from feeing emotionally numb or unable to having loving feelings for those close to him; quite a bit from feeling as if his future somehow will be cut short; extremely from having trouble falling or staying asleep; extremely from feeling irritable of having angry outbursts; moderately from having difficulty concentrating; extremely from being super-alert or watchful or on guard; and extremely from feeling jumpy or easily startled (Doc. 7-1, pp. 323-24/754).  These problems make it very difficult for Bruce to do his work, take care of things at home, and get along with other people (Doc. 7-1, pp. 324-25/754).

Also in October 2014, Bruce again participated in a research study with St. Jude Children's Research Hospital (Doc. 7-1, pp. 592-93/754).  Bruce was diagnosed with: (1) multiple cardiac abnormalities (but normal heart rhythm and conduction) including borderline heart muscle function based on ejection fraction (low range) and heart valve disorder (aortic sclerosis, aorto-mitral curtain fibrosis and thickening, and mitral sclerosis); (2) abnormal lipid levels; (3) borderline high blood pressure; (4) overweight; (5) an increased risk for diabetes; (6) abnormal thyroid hormone level (slightly low Free T4); (7) vitamin D deficiency; (8) borderline anemia; (9) reduced lung volumes, reduced airflow, and normal diffusion; and (10) low testosterone (Doc. 7-1, pp. 593-98/754).  The low testosterone and sterility were caused by having chemotherapy when he was 15 years old (Doc. 7-1, p. 687/754).  Echograms showed

testicular calcifications (Doc. 7-1, pp. 750-52/754).  In July 2015, Bruce was prescribed testosterone (Doc. 7-1, p. 633/754).

In March 2015, Bruce complained of dyspnea on exertion (walking two blocks) (Doc. 7-1, p. 726/754).  Bruce was referred to the MOVE program and tests were ordered (Doc. 7-1, p. 726/754).  Bruce weighed 275 pounds, he was 5' 9" tall, and his blood pressure was 147/92 (Doc. 7-1, p. 731/754).  X-rays showed no vascular congestion or acute pneumonic infiltrates (Doc. 7-1, pp. 751-53/754).

Bruce had an echocardiogram at the VA in April 2015 (Doc. 7-1, p. 643/754).  Bruce had normal left and right ventricle function (Doc. 7-1, p. 643/754).  Bruce was prescribed fish oil and niacin, as well as a low cholesterol and triglyceride diet, for his elevated triglycerides (Doc. 7-1, p. 713/754).  In June 2015, Bruce began physical therapy for his lumbosacral radiculopathy (Doc. 7-1, p. 644-45, 650-55/754).  Bruce also had numerous moles excised and biopsied (Doc. 701-08, p. 703/754).

In May 2015, Bruce's blood pressure was 151/91 (first) and 148/87 (second), he weighed 275 pounds, and his BMI was 40.6 (Doc. 7-1, p. 684, 686/754).  Bruce reported dizziness if he walked very far (Doc. 7-1, p. 684/754).

Bruce had an orthopedic surgery consult in May 2015 for his low back pain and radiating numbness and tingling down his legs since 2004 (Doc. 7-1, p. 699/754).  Bruce had lumbar spine flexion of 90, lateral flexion of 35, normal heel/toe walk, straight leg raises at 90 with low back pain and pain into the left thigh, and Para spinal tenderness (Doc. 7-1, pp. 699-700/754).  X-rays showed his lumbar vertebral heights and intervertebral disc spaces were maintained, but he had exaggeration of

13

the lumbar lordosis (Doc .7-1, pp. 700, 754/754).  Bruce was not a candidate for surgery due to his weight, and he stated he preferred not to have surgery (Doc 7-1, p. 700/754).  Bruce was prescribed lumbar traction and a TENS unit (Doc. 7-1, p. 700/754); he was already taking hydrocodone (Doc. 7-1, p. 713/754).

Janice Miller, the ADA Coordinator for LSU-Alexandria, wrote in a letter dated June 8, 2015 that she assisted Bruce with ADA[6] accommodations while he attended LSUA from Fall 2010 until his graduation (Doc. 7-1, p. 257/754).  Miller stated that Bruce had accommodations for, and struggled academically from, the symptoms associated with his PTSD, anxiety, and depression (Doc. 7-1, p. 258/754).  Miller's symptoms caused him to: miss classes; drop courses; eventually violate the "75% rule" and have to appeal to be readmitted to the University; have difficulty socializing with other students; often become angry; and be paranoid  (Doc. 7-1, p. 258-59/754).

Bruce moved out of Louisiana in 2015 due to eviction from his apartment and theft of his belongings (Doc. 7-1, p. 630/754).  Bruce moved in with friends in Victorville, Virginia (Doc. 7-1, pp. 630-31/754).  Bruce also stayed awhile in Apple Valley, California (Doc. 7-1, p. 681/754).  In June 2015, Bruce told his therapist that he had two hunts scheduled (Doc. 7-1, p. 630/754.  Bruce said he is an avid hunter and holds a world record and a state record (Doc. 7-1, p. 630/754).  Bruce had 3-4 past inpatient psychiatric hospitalizations, the last one in November 2013 at the VA Hospital in Alexandria, Louisiana (Doc. 7-1, p. 630/754).  Bruce complained of a sense

---

[6] Americans with Disabilities Act.

of loss of control including nightmares, intrusive ideation, and reactivity to cues that are reminders of trauma (Doc. 7-1, p. 630/754).   Bruce reported irritability/anger, insomnia, decreased concentration, and an exaggerated startle response (Doc. 7-1, p. 630/754).   Bruce reported that he used to drink heavily before his mother died of an accidental drug overdose in 2007, but drinks less heavily now (Doc. 7-1, p. 630/754). In June 2015, Bruce was taking Hydrocodone 10/Acetaminophen 325 mg, Niacin, Fish oil, Ibuprofen, Menthol/M-Salicylate, Methocarbamol 750 mg., and Trazodone HCL 50 mg (Doc. 7-1, p. 670/754).   Bruce's psychological symptoms were determined to be caused by a combination of his TBI and PTSD (Doc. 7-1, p. 671/754).   Bruce also had symptoms of dizziness, insomnia, headaches, memory problems, intermittent visual disturbances, and light sensitivity (Doc. 7-1, pp. 672, 677/754).   Bruce's mental status was good, his motor strength was normal, he did not have any atrophy, his reflexes were symmetrical, he had mild/moderate difficulty with tandem walking and his gait reflected left knee pain (Doc. 7-1, p. 677/754).   Mini-MSE and Beck tests showed no memory deficits (Doc. 7-1, p. 681/754).   Bruce was diagnosed with PTSD and a history of alcohol use disorder, and prescribed Trazodone, a trial of low dose Depakote ER (for mood and anger), and psychotherapy (Doc. 7-1, p. 682/754).

Bruce's social worker noted, in June 2015, that his anger problem began in 2006, and is triggered by lies, traffic, shopping, and the VA (Doc. 7-1, p. 679/754). Bruce was taken to jail in November 2013 because of his anger problem (Doc. 7-1, p. 679/754), Bruce has nightmares and flashbacks; he has had physical aggression (last in January 2014); he is verbally aggressive; he has trust issues; he does not like

leaving the house; his depression started in 2005; he has trouble going to sleep and staying asleep; he has pain at night; he has anxiety that started in 2004 (which causes gas, diarrhea, and racing heart); he does not like crowds; and he does not like being in places he has no control over (Doc. 7-1, p. 679/754).   Bruce has no psychotic symptoms (Doc. 7-1, p. 679/754).   Bruce has had four or five past suicide attempts (the last one in 2012 or 2013 by a pill overdose[7]), but in 2015 was no longer suicidal and was not homicidal (Doc. 7-1, p. 680/754).   Bruce was also suffering from: diffuse malignant lymphoma (small "non-c"); benign, essential hypertension; hyperlipidemia; ITP; depressive disorder NOS; and acute stress disorder (Doc. 7-1, pp. 685-86/754).

Bruce's back and sciatic nerve pain is caused by falls in 2004 and 2005 (Doc. 7-1, p. 673/754).   In June 2015, Bruce reported that he is unable to stand/walk more than 100 yards without increased pain and needing to rest (Doc. 7-1, p. 673/754).   X-rays of Bruce's lumbar spine, taken in March 2015, were unremarkable (Doc. 7-1, p. 674/754).   Bruce lacked mobility and flexibility in his lumbar spine (Doc. 7-1, p. 674/754).   Bruce was prescribed a home exercise program and physical therapy (Doc. 7-1, pp. 674-75/754).

In July 2015, Bruce's blood pressure was 114/75, he weighed 287 pounds, and was 5' 9" tall, and his BMI was 42.5 (Doc. 7-1, p. 337/754).   Bruce reported sharp, achy, chronic, constant low back pain (usually an 8 on a scale of 1 to 10) that increased with any physical activity (Doc. 7-1, p 342/754).   Bruce also complained of left knee

---

[7] Bruce was hospitalized and had his stomach pumped (Doc. 7-1, p. 680/754).

pain (Doc. 7-1, p. 343/754).  Bruce was diagnosed with: knee pain, for which he was prescribed hydrocodone as needed; onychomycosis, for which he was prescribed Terbinafine; PTSD, for which he was prescribed Mirtazapine, Sertraline, and Trazadone; liver lesions (a repeat ultrasound was ordered); and allergic rhinitis (Doc. 7-1, p. 339/754).

## 2.   Administrative Hearing

At his August 2015 administrative hearing, Bruce testified that he is 34 years old, right handed, 5'8" tall, weighs 250 pounds, and lives in Georgetown, Louisiana with his grandmother (Doc. 7-1, pp. 40, 42, 49/754).  Bruce testified he had lost about 60 pounds in the last year (Doc. 7-1, p. 41/754).

Prior to living in Georgetown, Bruce lived with his father in Alexandria, Louisiana for about six years (Doc. 7-1, p. 42/754).  Bruce receives Veteran's Benefits (for disability) of $2,900/month (Doc. 7-1, p. 42/754).  Bruce testified that he graduated from college in May 2014 with a Bachelor of Science degree in criminal justice (Doc. 7-1, p. 43/754).  It took Bruce about ten years to earn his degree, but he attended school full time the last three years (Doc. 7-1, p. 47/754).  Bruce took many of his classes online, and some exceptions were made for him pursuant to the ADA (Doc. 7-1, pp. 46-47/754).  Bruce testified that his counselor did not think he could work in the criminal justice field due to his PTSD (Doc. 7-1, p. 47/754).

Bruce joined the Army Reserves in September 2001, was on active duty from October 2002 to January or February 2006, and was discharged as a PV2 (Doc. 7-1, p. 43/754).  The highest rank Bruce attained was E4 (Doc. 7-1, p. 44/754).  Bruce

testified he was discharged with "a Chapter" due to his PTSD (Doc. 7-1, p. 44/754). Bruce was a nuclear, biological, and chemical warfare specialist with 74 Delta (Doc. 7-1, p. 44/754).

Bruce testified that he had about 20 jobs after he was discharged from the Army, such as truck driving, road construction, and security guard (unarmed) (Doc. 7-1, p. 44/754). Bruce worked as a security guard for about two weeks (Doc. 7-1, p. 45/754). Bruce made deliveries for Coca-Cola for about a year and Bruce had to keep delivery records (Doc. 7-1, p. 45/754).

Bruce testified that his PTSD, depression, anger, flashbacks, night terrors, difficulty being outside, and difficulty being around a lot of people prevent him from working (Doc 7-1, p. 45/754). Bruce testified that he is still getting treatment for his PTSD, sometimes twice a week (Doc. 7-1, p. 45/754). Bruce stopped drinking alcohol a year ago, and said his memory has improved since he stopped (Doc. 7-1, p. 46/754). When Bruce was drinking, he drank by himself and usually drank bourbon (Doc. 7-1, p. 51/754). Bruce testified that he told the VA staff that he was drinking (Doc. 7-1, p. 52/754). Bruce was counseled on the drinking, but it took him a long time to completely quit (Doc. 7-1, p. 52/754). Bruce was drinking when he made his suicide attempts, and has not attempted suicide since he stopped drinking, although he still has suicidal thoughts (Doc. 7-1, p. 60/754).

Bruce has a 100% permanent, total disability rating from the VA and his disability makes him unemployable (Doc. 7-1, pp. 55-546/754). Bruce testified he is 100 % disabled for PTSD, 100% for anxiety and depression, 30 or 50 % for his back,

10 % for his thumb, and does not know what his disability ratings are for his leg and hearing (Doc. 7-1, p. 60/754).

Bruce testified that he can lift 10 to 15 pounds and he can stand comfortably for ten to fifteen minutes (Doc. 7-1, pp. 47-48/754).  Bruce does physical therapy for his back, and gets cortisone shots (Doc. 7-1, p. 48/754).

Bruce testified he had stayed in California with an Army friend who had developed cancer (Doc. 7-1, pp. 48-49/754).  Bruce was giving her moral support based on his own experience with past cancer (lymphoma) (Doc. 7-1, p. 48-754).

Bruce testified that he does not understand what is wrong with his heart or lungs, but the VA doctor took him off of one medicine and prescribed something else (Doc. 7-1, p. 49/754).  Bruce does not smoke (Doc. 7-1, p. 49/754).  Bruce is in the Life Program with St. Jude Children's Hospital, so they are studying the effects of chemotherapy and radiation on his body (Doc. 7-1, p. 57/754).  Bruce testified that his heart has (ejection) problems, and St. Jude and the VA are working together to determine what needs to be done (Doc. 7-1, pp. 56-57/754).  St. Jude and the VA are also working together on his sterility problem (Doc. 7-1, p. 57/754).

Bruce testified that his depression and pain make him not want to get out of bed some days (Doc. 7-1, p. 49/754).  Bruce watches TV, sleeps, and uses his computer (Facebook and You-Tube) for most of the day (Doc. 7-1, pp. 49-50/754).  Bruce also hunts deer (without a deer stand) on hunts arranged for disabled veterans (Doc. 7-1, p. 50/754).  Bruce testified that he travels sometimes, and he flies when he travels out of state (Doc. 7-1, p. 50/754).  Bruce's only hobby is hunting, and he testified that

he does not enjoy it as much as he used to due to pain[8] (Doc. 7-1, pp. 50-51/754). When Bruce goes on a hunt, it lasts two to five days, depending on where they go and how he feels (Doc. 7-1, p. 51/754). Bruce testified that he does not do anything socially (Doc 7-1, p. 52/754).

Bruce has difficulty getting things done at home, like washing dishes, washing clothes, or cleaning the house, because it is overwhelming and he does not have much energy (Doc. 7-1, p. 58/754). Bruce's vitamin D deficiency, low iron, and depression affect his energy level (Doc. 7-1, p. 58/754).

Bruce drives a small truck (automatic transmission) (Doc. 7-1, p. 43/754) about two days a week, to appointments or the store (Doc. 7-1, p. 52/754). Bruce testified that he grocery shops and can carry light bags (Doc. 7-1, p. 52/754).

Bruce testified that he had difficulty with a couple of teachers in college when he missed classes due to surgery (Doc. 7-1, p. 53/754), but got extensions to make up his work (Doc. 7-1, p. 53/754). Bruce testified that one ADA accommodation was that he did not have to attend class (Doc. 7-1, p. 56/754). Bruce's teachers emailed him the assignments and the materials they went over in class, he turned in his paperwork through email, and he took tests in a testing facility or online (Doc. 7-1, p. 56/754). Bruce testified they also gave him extra time to do his assignments and, if he went to class, he could leave the class at any time (Doc. 7-1, p. 56/754).

Bruce has had melanoma removed from his shoulder, chest, stomach, and back (Doc. 7-1, pp. 53-54/754). Pre-melanoma was found in April 2015 (Doc. 7-1, p. 55/754).

---

[8] Bruce also testified his enjoyment of hunting has been affected by death threats he received due to publicity when he killed a very large deer a few years before (Doc. 7-1, pp. 50-51/754).

Bruce testified that studies have indicated the lesions on his liver, his sterility, and the melanoma may be connected to his military service (due to the burn pits) (Doc. 7-1, p. 55/754).

Bruce testified that he is undergoing physical therapy for his TBI, to help him not be dizzy, and is in the MOVE program to lose weight (Doc. 7-1, p. 54/754). Bruce is also having testosterone replacement therapy (Doc. 7-1, p. 54/754).

Bruce testified that he still has anger problems and a problem controlling things (Doc. 7-1, p. 57/754). When things upset him, he feels better if he breaks something (Doc. 7-1, p. 57/754). Bruce is unable to control his anger, so he focuses it on breaking things (Doc. 7-1, p. 57/754).

Bruce also testified that he has trouble concentrating (Doc. 7-1, p. 58/754). Sometimes he stutters because his thoughts bounce around a lot, and sometimes the things he says sound offensive, wrong, unclear, or jumbled (Doc. 7-1, p. 58/754).

Bruce testified that he has nightmares about Iraq, stress dreams if something big is going on in his life, and night terrors about the war (Doc. 7-1, pp. 58-59/754). On a designated "survivor's day," Bruce suffers from survivor's remorse and he does not function as well as on other days (Doc. 7-1, p. 59/754). Bruce said he spends most of the day in his room for about half of the month (Doc. 7-1, p. 59/754).

Bruce's father, Marion Bruce, also testified (Doc. 7-1, p. 71/754). Marion Bruce testified that he is close to his son and they used to live together, but he was recently in California for six months (Doc. 7-1, pp. 61-62/754). Marion Bruce testified that he heard Bruce scream at night when they lived together (Doc. 7-1, p. 62/754).

Sometimes Marion Bruce would step into Bruce's room to wake him up, and when he said Bruce's name, Bruce would wake and scream in fear (Doc. 7-1, p. 62/754).  When that happened, Marion would try to calm Bruce down (Doc. 7-1, p. 62/754).  Marion and his son got along well when they lived together, and Marion gave Bruce space when he needed it (Doc. 7-1, p. 62/754).  Marion Bruce testified that Bruce did not help much with chores (Doc. 7-1, p. 62/754).

Marion Bruce testified that he did not like it when Bruce drank, but Bruce quit drinking recently (Doc. 7-1, p. 63/754).  Marion Bruce testified that not drinking has not helped Bruce with being frightened or made any difference with his problems (Doc. 7-1, p. 63/754).  Marion Bruce also testified that, if Bruce was not his son, he could not have "handled" Bruce's screaming, hollering, and cussing (Doc. 7-1, p. 63/754).

Marion Bruce testified hunting is Bruce's favorite activity (Doc. 7-1, p. 63/754).  On a usual day, Bruce watches TV, talks on the phone, and spends 99 % of his time alone (Doc. 7-1, p. 64/754). Bruce does not interact with other people (Doc. 7-1, p. 63/754).

The VE testified that Bruce's past work as a sales route driver was medium work (DOT 292.353-010, SVP 3), and his past work as a smoke and flames specialist (Army) was heavy work (DOT 378.682-014, SVP 4) (Doc. 7-1, p. 65/754).

The ALJ posed a hypothetical involving a person of Bruce's age, education, and work experience, who can lift/carry up to 20 pounds occasionally and ten pounds frequently, can stand/walk for about six hours, and can sit for six hours (Doc. 7-1, p.

65/754).  Because of emotional problems, the person cannot do complex work (follow complex instructions), and requires a work environment with only occasional interaction with others, working with things rather than people (Doc. 7-1, pp. 65-66/754).  The VE testified that such a person can work as a cafeteria attendant (DOT 311.677-010, light work, SVP 2, 59,675 jobs in the nation), or a price marker (DOT 209.587-034, light work, SVP 2, 317,760 jobs in the nation).

The ALJ posed a second hypothetical that is the same as the first, but has the additional condition that the person has emotional problems or episodes of anger that occur about three days a month and prevent him from completing his work tasks or his time at work (Doc. 7-1, p. 66/754).  The VE testified that such a person would not be able to do any work on a sustained basis (Doc. 7-1, p. 66/754).

The VE posed a third hypothetical which is the same as the first but with the additional condition that, because of emotional issues, the person might not want to leave the house and it might cause him to miss a couple of days per month (and one could not predict which days) (Doc. 7-1, pp. 66-67/754).  The VE testified that such a person would not be able to do any work (Doc. 7-1, p. 67/754).

## C.    ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Bruce (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work

he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Bruce last worked in 2010, but did not engage in substantial gainful activity during the period from his alleged onset date of November 1, 2010 through his date last insured of December 31, 2014 (Doc. 7-1, p. 24/754).  The ALJ also found that Bruce has severe impairments of PTSD, hypertension, history of substance abuse, obesity (BMI 42), stage 2 kidney disease, lumbar strain, and a history of precancerous skin lesions (Doc. 7-1, pp. 24, 32/754), but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 7-1, pp. 25, 32/754),.  The ALJ also found that Bruce is unable to perform his past relevant work as a smoke and flame specialist or a driver/sales representative (Doc. 7-1, p. 32/754),

At Step No. 5 of the sequential process, the ALJ further found that Bruce has the residual functional capacity to perform the full range of light work except that he cannot do complex work, he should work with things rather than with people, and he should work in an environment with only occasional interaction with others (Doc. 7-1, p. 27/754).  The ALJ found that Bruce is a younger individual with at least a high school education (Doc. 7-1, p. 32/754).  The ALJ found that, as of December 31, 2014 (the date Bruce was last insured), there were jobs that existed in significant numbers in the national economy that Bruce could do, such as cafeteria attendant and price marker (Doc. 7-1, pp. 32-33/754).  The ALJ concluded that Bruce was not disabled, as defined in the Social Security Act, at any time from November 1, 2010 through December 31, 2014 (Doc. 7-1, p. 33/754).

## II.   Law and Analysis

### A.   Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence, which support the Commissioner's decision,

but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See Dellolio, 705 F.2d at 125.  However, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### B. The ALJ failed to properly evaluate the evidence and assess Bruce's residual functional capacity.

Bruce contends the ALJ erred in failing to properly evaluate and incorporate his mental impairments, as documented by the VA, by failing to assign appropriate weight to the VA's finding that Bruce is 100 % disabled by his PTSD and by failing to find that Bruce suffers from PTSD.  Bruce further argues the ALJ erred in in the assessment of Bruce's residual functional capacity by not including his mental limitations.

A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ.  See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001).  In Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir. 1981), the Fifth Circuit stated that a VA disability determination is entitled to "great weight."  In Chambliss, the Fifth Circuit explained that, while this is true in most cases, the relative weight to be given this type of evidence will vary depending upon the factual circumstances of each case.  Since the regulations for disability status differ between the SSA and the VA, ALJs need not give "great weight" to a VA disability determination if they adequately explain the valid, specific reasons for not doing so.  See Chambliss, 269 F.3d at 522; see also Bird v. Commissioner, 699 F.3d 337, 343 (4th Cir. 2012).  The ALJ must consider both the agency's findings and the evidence underlying them.  See Kinash v. Callahan, 129 F.3d 736, 739 (5th Cir. 1997).  Failure to do so constitutes reversible error.  See Welch v. Barnhart, 337 F.Supp.2d 929, 935 (S.D.Tex. 2004) (citing Kinash, 129 F.3d at 739).

The Social Security Administration, also, has stated that a disability determination by another governmental agency cannot be ignored and must be considered because it may provide insight into the individual's mental and physical impairments and show the degree of disability determined by these agencies based on their rules.  See S.S.R. 06-03p, "Considering Opinions and Other Evidence from

Sources Who are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies."

In the case at bar, the VA assigned Bruce's service-connected PTSD, with major depression and alcohol abuse, a 100 % disability rating.

The ALJ stated in his decision:

> As for the opinion evidence, physicians affiliated with the Veterans Administration **determined the claimant 100% [sic] due to major depression and alcohol abuse** effective November 13, 2013.  This was based on the claimant's intermittent inability to perform activities of daily living, total occupational and social impairment, intermittent inability to performance [sic] maintenance of minimal personal hygiene and difficulty in adapting to work.  The claimant could not complete a workweek without interruption from psychologically based symptoms. It was likely that he could not complete a workweek without being disruptive to co-workers due to psychologically based symptoms.  The claimant could perform sedentary work.  His lumbar strain and right thumb would interfere with heavy lifting, pushing, pulling, prolonged walking or standing.  The undersigned considered this opinion; however, gives little weight to this opinion.  The undersigned finds this opinion was inconsistent with the record as a whole.  The evidence of record did not support such restriction.  [Emphasis added.]

The ALJ's decision contains a substantive error.  The VA assigned Bruce a 100% service-connected disability rating, as of November 13, 2013, due to *post-traumatic stress disorder*, with major depression and alcohol abuse (Doc. 7-1, pp. 265-66/754).  The VA found Bruce's PTSD with depression and alcohol abuse is totally disabling, and the ALJ appears to have misunderstood that finding.  The ALJ stated that Bruce has a 100% disability rating from the VA due only to major depression and alcohol abuse (Doc. 7-1, p. 31/754).  The ALJ's error as to the basis for Bruce's 100% service-connected disability appears to be the reason why the ALJ gave "little

weight" to the VA's "opinion" that Bruce is 100% disabled[9] because it was "inconsistent with the record as a whole" (Doc. 7-1, p. 31/754).  There is no other medical evidence in the administrative record that contradicts the VA physicians' tests, findings, and opinions.

The ALJ found that (in his personal opinion) Bruce's activities of hunting, watching TV, using a computer, going to movies, and driving his truck are incompatible with a finding that Bruce's is totally disabled (Doc. 7-1, p. 31/754).  The ALJ purports to bolster his personal opinion by giving "some weight" to the opinion of a non-examining, state agency psychological consultant, Kelly Ray, who reviewed Bruce's medical records in March 2015[10] and stated that Bruce can work in a slower-paced environment that does not require high output or extensive interaction/exposure to others, especially in a multi-cultural context (Doc. 7-1, p. 108/754).  Kelly Ray based his opinion in part on the fact that Bruce had recently completed college (Doc. 7-1, p. 108/754).

---

[9] The ALJ recited the VA's findings that Bruce (1) has an intermittent inability to perform activities of daily living; (2) has total occupational and social impairment; (3) has an intermittent inability to perform maintenance of minimal personal hygiene and difficulty in adapting to work; (4) cannot complete a workweek without interruption from psychologically based symptoms; (5) likely cannot complete a workweek without being disruptive to co-workers due to psychologically based symptoms; and (6) has lumbar strain and right thumb problems that would interfere with heavy lifting, pushing, pulling, prolonged walking or standing (Doc. 7-1, p. 31/754).

[10] Kelly Ray filled out a Mental Residual Functional Capacity Form (Doc. 7-1, pp. 107-09) which states that Bruce: (1) does not have understanding and memory limitations; (2) has concentration and persistence limitations in that he is moderately limited in his ability to work in coordination with or in proximity to others without being distracted by them, and is moderately limited in his ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (3) had moderate social limitations in his ability to interact appropriately with the general public and his ability to get along with coworker or peers without distracting them or exhibiting behavioral extremes.

The ALJ erred in giving more weight to the opinion of a non-examining consultant, psychologist Kelly Ray, than to the opinions of Bruce's treating physicians. A treating physician's opinion is entitled to more weight than that of a consulting physician who has never examined the applicant, or when the consulting physician examined the applicant only on a "one-shot" basis. See Bowman v. Heckler, 706 F.2d 564, 568 (5th Cir. 1984) (citing Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981)); Warncke v. Harris, 619 F.2d 412, 416 (5th Cir. 1980); Strickland v. Harris, 615 F.2d 1103, 1109-1110 (5th Cir. 1980); Williams v. Finch, 440 F.2d 613, 616-17 & n. 6 (5th Cir. 1971). In this case, the treating physicians' findings and conclusions are amply supported by diagnostic tests. The VA's mental health counselors and PTSD clinic performed several tests, and their results, findings, and conclusions are in the administrative record.

Moreover, other than the opinion of non-examining consultant Kelly Ray, the only medical evidence in the administrative record is from the VA. Therefore, in rejecting the opinions of the VA healthcare providers, the ALJ rejected virtually all of the medical evidence in the record. An administrative law judge may not arbitrarily reject uncontroverted medical testimony. See Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982) (citing Goodley v. Harris, 608 F.2d 234, 236-37 (5th Cir. 1979)); see also Mims v. Califano, 581 F.2d 1211, 1215 (5th Cir. 1978); Payne v. Weinberger, 480 F.2d 1006, 1008 (5th Cir. 1973); Williams v. Finch, 440 F.2d 613, 616 (5th Cir. 1971) (the VA's finding of total disability "is a strong straw in the wind

in view of the independent and positive findings of physical disability and the complete absence of statements to the contrary").

Furthermore, the ALJ erroneously substituted his own inexpert opinion and that of a one-time, non-examining consultant for the opinions of all of Bruce's treating physicians.  ALJ's have been warned by the courts against "playing doctor" and making their own independent medical assessments.  See Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2002).  An ALJ does not have the medical expertise to substitute his opinion as to the nature of a claimant's medical complaints for the supported and unrefuted diagnosis of the treating physicians.  See Frank, 326 F.3d at 622; Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990), cert. den., 502 U.S. 901 (1991).

The ALJ also found that Bruce's admitted activities of watching TV, using a computer, hunting, grocery shopping, going to New Orleans in 2014, visiting a friend in California in 2015, and driving indicate he is not disabled (Doc. 7-1, p. 31/754). However, the sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity.  Thompson v. Sullivan, 987 F.2d 1482, 1490  (10th Cir. 1993); see also Draper v. Barnhart, 4265 F.3d 1127, 1131 (8th Cir. 2005) (the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full time competitive work); Cooper v. Bowen, 813 F.2d 557, 561 (9th Cir. 1987) (the ability to perform some household chores is not necessarily incompatible with an application for disability benefits); Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981)

(for a disabled claimant who hunted and shopped, the court stated "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity").  A claimant need not be completely incapacitated to receive benefits.  <u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1162 (9th Cir. 2014).  It is noted that, when Bruce went to New Orleans, he was overwhelmed and had a panic attack (Doc. 7-1, p. 370/754).  In any event, Bruce related his daily activities to his mental health care givers and he was still assigned a 100% disability rating for his PTSD.  The only opinions to the contrary is those of the ALJ and the non-examining consultant.

The ALJ further reasoned that Bruce was noncompliant with treatment because: (1) in August 2014, he delayed having skin tags removed so he could go on a hunting trip; (2) in August 2014, Bruce declined statin therapy and referral to the lipid clinic due to his impending hunting trip; (3) in August 2014, Bruce refused placement in a 12-week cognitive processing therapy for his PTSD; (4) Bruce missed appointments on March 4, 2014, June 30, 2014, and July 7, 2014; (5) on July 22, 2014, he declined medication therapy (statin) for elevated triglycerides; and (6) on May 10, 2014, Bruce refused a rectal examination (Doc. 7-1, p. 30/754).  However, (1) the skin tag removal was simply delayed to September and the medical records do not indicate this was an unreasonable request (Doc. 7-1, pp. 317, 329-30/754); (2) the lipid clinic referral was delayed due to the impending hunt, despite a warning of the high risk of a cardiovascular event  (Doc. 7-1, pp. 329-30/754); (3) the record does not indicate why Bruce declined the 12-week cognitive processing therapy for his PTSD, but shows he

indicated he would be interested in attending inpatient treatment instead (Doc. 7-1, p. 332/754); (4) Bruce called the day after he missed his July 7, 2014 appointment with his social worker, he told his social worker he had forgotten about his June 30, 2014 appointment, and he called and cancelled his March 4, 2014 appointment with his social worker when an earlier appointment ran too long (Doc. 7-1, pp. 346, 351, /754); (5) Bruce declined medication therapy (low dose statin) and stated he would like to try dietary modification, instead, and return to the clinic in one month (Doc. 7-1, pp. 340/754)[11]; and (6) Bruce refused a rectal exam on May 11, 2014 because (he said) there was nothing wrong with his prostate (he had gone to the clinic with complaints of a urinary tract infection or kidney stones) (Doc. 7-1, pp. 365, 566/754).

The administrative record contains medical records from 2008, including treatment for heart problems, PTSD with depression, anxiety, and back and sciatic nerve pain.  Given the number of appointments and treatments involved in this case, the few cited instances do not amount to noncompliance with treatment, as the ALJ suggests.

Finally, the ALJ reasoned that, since Bruce stopped drinking, he has not attempted suicide (Doc. 7-1, p. 31/654).  Apparently, the ALJ believed Bruce is not depressed, or is less depressed, if he is not drinking.  Again, the ALJ based this determination on the misapprehension that alcohol abuse and depression formed the

---

[11] There is also a July 21, 2014 note in the medical records that Bruce had been advised to stop taking "other medication" while on medications for physical issues, and he was advised by his social worker to discuss his medication combinations with his primary care provider (Doc 7-1, pp. 344-45/754).

basis of the VA's 100% disability rating, instead of PTSD with alcohol abuse and depression.

The SSA cannot include the effects of alcoholism in its disability determination. Section 105 of the Contract with America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat. 847, 852-55 (1996), amended pertinent portions of the Social Security Act to prohibit the award of DIB and SSI to individuals disabled by alcoholism or drug addiction. See 42 U.S.C. §§ 423(d)(2)(C), 1382(c)(3)(J).[12] Apparently, the ALJ believed that alcohol abuse was a substantial factor in Bruce's depression, so when he stopped drinking, much of the basis for the VA's 100% disability rating went away. However, since Bruce's 100% disability rating from the VA is based on *PTSD* with depression and alcohol abuse, the ALJ did not adequately consider his PTSD. Bruce's father testified that, when Bruce stopped drinking, his problems from PTSD did not disappear or improve (Doc. 7-1, p. 63/754). Moreover, Bruce's medical records showed that Bruce's recurrent major depression is secondary to and due to his PTSD, and he abuses alcohol as self-medication for his PTSD, to avoid thinking about his traumas (Doc. 7-1, pp. 521-22/754).

Because the ALJ erred by misunderstanding the basis for the VA's 100% disability rating for Bruce, rejecting all of the medical evidence in the record, substituting his own opinion for that of the medical evidence, and making other errors

---

[12] Under the amended regulations, the key factor the Commissioner must examine in determining whether drugs or alcohol are a contributing factor to the claim is whether the Commissioner would still find claimant disabled if he or she stopped using drugs or alcohol. See 20 C.F.R. § 416.935(b)(1). Under this regulation, the ALJ must evaluate which of Bruce's current physical and mental limitations would remain if claimant stopped using alcohol and then determine whether any or all of Bruce's remaining limitations would be disabling.

in his reasoning, substantial evidence does not support the conclusions of the ALJ and the Appeals Council that Bruce is able to work, and their decision is incorrect as a matter of law.

However, this does not entitle Bruce to a decision in his favor based upon the existing record. The record is simply inconclusive as to the nature of Bruce's impairments without alcohol abuse as a contributing factor, and whether there are any jobs existing in sufficient numbers in the national economy which Bruce can perform, given his true impairments. Therefore, Bruce's case should be remanded to the Commissioner for further proceedings.

### D. The evidence indicates that Bruce may meet Listing 12.06.

Bruce also alleges the ALJ erred in failing to find he meets Listing 12.06. Bruce further contends the ALJ should have employed a medical consultant to determine whether Bruce's PTSD meets or equals Listing 12.06.

If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled. See Cieutat v. Bowen, 824 F.2d 348, 351 n.1 (5th Cir. 1987); see also Selders v. Sullivan, 914 F.2d 614, 619 n. 1 (5th Cir. 1990). A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. See Sullivan v. Zebley, 493 U.S. 521 (1990); see also Selders, 914 F. 2d at 619. For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. See Zebley, 110 S. Ct. at 891.

Listing 12.06, Anxiety Related Disorder, states:

In these disorders, anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

        a. Motor tension; or

        b. Autonomic hyperactivity; or

        c. Apprehensive expectation; or

        d. Vigilance and scanning; or

    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

    4. Recurrent obsessions or compulsions which are a source of marked distress; or

    5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

    AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

    OR

C. Resulting in complete inability to function independently outside the area of one's home.

The ALJ stated in his decision (Doc 7-1, p. 25/754) that "the evidence of record clearly shows the claimant does not have any marked restrictions."   The ALJ explained:

> Treatment notes from the VA noted the claimant's affect was appropriate and his mood euthymic.  His memory was intact and his concentration within normal limits.  His appearance was appropriate.  The claimant testified he drives a truck.  He graduated from college in May of 2014.  On March 19, 2015, the claimant completed a "Function Report."  The claimant reported he went hunting more than 15 times last year.

The ALJ further stated (Doc 7-1, p. 25/754): "Prior to the date last insured, the evidence documented a diagnosis of post-traumatic stress disorder.  However, this impairment did not result in any marked limitations or the inability of the claimant to function outside his home."   The ALJ relied on the Mental Residual Functional Capacity Assessment by non-examining psychologist Kelly Ray, and gave "very little weight" to the "opinion" of the VA.  The ALJ's reasoning, that Bruce's memory, mood, affect, and concentration were normal, did not use the correct criteria for evaluating an impairment under Listing 12.06.

The VA found Bruce has near-continuous panic affecting the ability to function independently, appropriately and effectively (panic attacks more than once a week), marked alterations in arousal and reactivity associated with the traumatic events: irritable behavior and angry outbursts with little or no provocation, typically expressed as verbal or physical aggression toward people or objects; hypervigilance; and an exaggerated startle response.  Therefore, Bruce appears to meet 1, 3, and 5 of 12.06(A).

The VA also found that Bruce has problems with concentration; his near-continuous panic or depression affects his ability to function independently, appropriately, and effectively; he has difficulty in adapting to stressful circumstances, including work or a work-like setting; and he has only an intermittent inability to perform activities of daily living, including maintenance of minimal personal hygiene.  It is not clear whether those findings meet 1, 2, and 3 of 12.06(B).

The ALJ has the discretion to order a consultative examination.  An examination at government expense is not required unless the record establishes that such an examination is necessary to enable the ALJ to make the disability decision.  See Anderson v. Bowen, 887 F.2d 630, 634 (5th Cir. 1989); see also Brock v. Chater, 84 F.3d 726 (5th Cir. 1996); Wren v. Sullivan, 925 F.2d 123, 127 (5th Cir. 1991); Haywood v. Sullivan, 888 F.2d 1463, 1472 (5th Cir. 1989).  The ALJ did not find a consultative exam was necessary because he inappropriately rejected the medical evidence from the VA.

A consultative examination may be necessary in this case to determine whether Bruce meets Listing 12.06(A).  That determination should be made on remand after consideration of the VA medical records.

## III.    Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Bruce's case be REMANDED to the Commissioner for further proceedings consistent with the views expressed herein.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this ____18th____ day of January, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge